**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PHILIP J. ASHLEY,<br>4021 Blue Slate Drive<br>Alexandria, VA 22306<br><br>     *Plaintiff*,<br><br>v.<br><br>EMILY W. MURPHY, in her official<br>capacity as Administrator of the<br>GENERAL SERVICES ADMINISTRATION<br>1800 F Street, NW<br>Washington, DC 20405<br><br>     *Defendant*. | Civil Action No. 18-cv-00574 |

**COMPLAINT AND JURY DEMAND**

**NATURE OF THE ACTION**

1.      Plaintiff Philip Ashley ("Mr. Ashley") is a blind employee of the General Services Administration ("GSA" or "the agency").  Mr. Ashley brings this lawsuit to force his employer to stop violating the accessibility laws codified in Sections 508 and 501 of the Rehabilitation Act of 1973 and to stop unlawfully discriminating against him on the basis of his disability.

2.      The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in federal programs and employment, as well as requires federal agencies' information technology to be accessible to people with disabilities, including federal employees.  The Act was designed to promote equal access to and participation in services, programs, employment, and technology by persons with disabilities—the same type of access that Mr. Ashley seeks today.

3.      Section 508 was amended in 1998 to require GSA, "[w]hen developing, procuring, maintaining, or using electronic and information technology," to ensure that disabled GSA employees have access to and use of information and data that is comparable to the access of employees without disabilities.

4.      As Mr. Ashley's case illustrates, GSA still today routinely and regularly fails to comply with this mandate.  This continued failure has required Mr. Ashley to spend hundreds of hours per year struggling to overcome accessibility impediments, among other things, placing him at a profound disadvantage—both professionally and otherwise—*vis-a-vis* his sighted colleagues.

5.      To make matters worse, GSA has failed time and time again to provide reasonable accommodations for Mr. Ashley's disability, in violation of Section 501 of the Rehabilitation Act.

6.      GSA also has denied Mr. Ashley the training and promotions necessary to advance in his career because of his disability, despite Mr. Ashley's diligent efforts to advance in his career, assist his colleagues, and get promoted.

7.      This action seeks, among other things, injunctive relief and compensatory damages for the injuries Mr. Ashley has suffered at the hands of GSA—the very injuries that the Rehabilitation Act was designed to prevent.

## THE PARTIES

8.      Plaintiff Mr. Ashley is a citizen of the United States and a resident of the state of Virginia.  At all times relevant to this complaint, Mr. Ashley has been employed by GSA in Washington, D.C.

9.      GSA is a Federal government agency subject to the Rehabilitation Act of 1973. Defendant Emily W. Murphy ("Defendant") is the Administrator of GSA.  Defendant leads the GSA which oversees more than 371 million square feet of property and approximately $54 billion in annual contracts.  Ms. Murphy is sued in her official capacity as the Administrator of GSA.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Defendant because Defendant's primary place of business is in the District of Columbia, where the headquarters of GSA is located, and the acts and injuries complained of herein occurred in the District of Columbia.

11.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this action raises a federal question.  Subject matter jurisdiction also exists under 42 U.S.C. § 1981a and 29 U.S.C. § 794a of the Rehabilitation Act.

12.     Under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in this judicial district as plaintiff is employed by GSA in the District of Columbia and the District of Columbia is where violations of law at issue in this case occurred and where plaintiff's personnel records are maintained by GSA.

## FACTUAL BACKGROUND

### A.      Philip Ashley

13.     Mr. Ashley has degrees in accounting and business administration from Western Michigan University.  He has been employed with GSA since 2000.  Since 2008, Mr. Ashley has been a level GS-13 Financial Analyst in the Office of the Chief Financial Officer, Financial Management Division.

14.     Mr. Ashley's job responsibilities include accounting analysis, financial analysis, and preparing reports concerning lease profitability, labor distribution, and other government assets and liabilities.  His responsibilities require gathering information from financial and portfolio domains from the various databases GSA maintains.  Database research accounts for roughly 70 percent of Mr. Ashley's time.

15.     Mr. Ashley's performance evaluations over the years have been consistently strong.  Mr. Ashley's supervisors have indicated that Mr. Ashley's knowledge of certain reporting systems is exceptional; that he has effectively achieved his performance goals and furthered his skills by working on different internal controls and performance measures; and that he has done a "great job" of expanding his role within the branch through his strong leadership efforts.  Mr. Ashley has trained several Financial Analysts who have gone on to supervisory positions.

16.     In 2016, Mr. Ashley received the Integrity Collaboration and Excellence (ICE) award as part of a peer recognition program.

17.     Mr. Ashley is blind.

18.     To accommodate his blindness, Mr. Ashley has been provided with a brand of screen access or screen reader software called Job Access With Speech (JAWS).  As a blind computer user, Mr. Ashley uses a JAWS screen reader which converts digital information to synthesized speech.  It can read aloud information presented on a computer screen including text in documents, websites, e-books, and other formats.

19.     Although Mr. Ashley's JAWS software reads everything that is on his computer screen, GSA's technology is not entirely compatible with it.  For example, images or internet links must have alt-text "descriptions" for JAWS to be able to read them to Mr. Ashley.  Unless

these descriptions are included, JAWS cannot discern the content of the links or images.  In

addition, because Mr. Ashley cannot use a computer mouse to "click" on or activate buttons or

links, websites, web applications, documents (such as PDFs), and software must be tagged and

coded a certain way to allow Mr. Ashley's screen reader to activate and recognize text using

JAWS keyboard commands or keystrokes rather than a computer mouse.

20.     Mr. Ashley also has been provided with a sighted reading assistant ("reader") to

help him navigate inaccessible documents, websites, web applications, and software.  Although a

reader can be helpful to Mr. Ashley, that reader must have the right technical training to assist

Mr. Ashley effectively with the tools necessary to perform required and specialized tasks.

Without the right technical training, Mr. Ashley must spend valuable work time training the

reader on the substantive concepts and methodology used, as opposed to working on substantive

assignments.  Even with the right technical training, readers are oftentimes unexpectedly absent

from work, leaving Mr. Ashley without assistance.  In addition, anytime a reader is replaced, Mr.

Ashley must train a new reader to assist him with his job responsibilities.  Mr. Ashley does not

have oversight of the hiring of or direct supervision over his readers, who are employees of a

GSA-contracted vendor.

21.     In the last several years, Mr. Ashley has encountered an increasing amount of

inaccessible information technology at GSA that he cannot effectively use with his JAWS screen

reader or his reading assistant.  This inaccessibility has caused Mr. Ashley difficulty in

performing the functions of his job and has resulted in his being denied training, opportunities

for advancement, and promotions to new positions.

22.     Mr. Ashley's job requires him to use, among other things, the following systems:

Electronic Time & Attendance Management System (ETAMS), Financial Management

Information System (FMIS), Pegasys, SAP BusinessObjects, Citrix Access Gateway, and Oracle's Occupancy Agreement Tool. These systems allow Mr. Ashley to access, review, gather, and analyze various financial information and data on the agency's expenses and revenue, leases, contracts, labor distribution, and projects.

23.    Although Mr. Ashley has a JAWS screen reader as an accommodation, the majority of the systems that Mr. Ashley is required to use for work are largely incompatible with his JAWS screen reader. For example, the ETAMS, FMIS, and SAP BusinessObjects interfaces are inaccessible to Mr. Ashley using his JAWS screen reader. Additionally, although Mr. Ashley can more easily navigate Pegasys and Oracle's Occupancy Agreement Tool, there remain certain portions of the interfaces that cannot be accessed with JAWS keyboard commands and that do not provide relevant audible feedback to Mr. Ashley.

24.    Mr. Ashley has been required to troubleshoot this inaccessible technology and address reasonable accommodation needs from his cubicle, a public space where his coworkers can hear his discussions with his supervisors and IT personnel. For example, he has been required to openly conduct meetings with his supervisors in his cubicle regarding private issues involving his disability and workplace accommodations. He also has in several instances had to share his social security number and login credentials audibly with his reading assistant.

### B.    Oracle Business Intelligence Software

25.    In 2009, GSA procured a new software called Oracle Business Intelligence. The agency subsequently shifted this software from a backend database to a web-based tool in 2017.

26.    GSA did not have this software tested for Section 508 compliance during development, procurement, maintenance, or use.

27.     On January 25, 2017, Georgia Davis-Leggett, Director of the Office of the Chief

Financial Officer, sent an email to all Office of the Chief Financial Officer employees, including

Mr. Ashley, strongly encouraging them to take a training on the agency's Oracle Business

Intelligence software and to begin using Oracle Business Intelligence in order to generate reports

more efficiently.

28.     According to Oracle's website, the Oracle Business Intelligence software is a

"portfolio of technology and applications that provides the industry's first integrated, end-to-end

Enterprise Performance Management System, including BI foundation and tools—integrated

array of query, reporting, analysis, alerting, mobile analytics, data integration and management,

and desktop integration—as well as category-leading financial performance management

applications, operational BI applications, and data warehousing."[1]

29.     With respect to its use at GSA, Oracle Business Intelligence provides a single

source through which to view GSA's different data sources and databases.  Oracle Business

Intelligence allows GSA Financial Analysts to cross-query several GSA systems, such as FMIS,

Inventory Reporting Information System (IRIS), Real Estate Across the United States (REXUS)

Inventory, and Enterprise Acquisition Solutions Integration (EASi), through one source, as

opposed to forcing users to mine multiple, individual data sources for the same information.  The

Oracle Business Intelligence software's ability to generate reports on assets, contracts, financials,

and projects is a capability that is not available through any other single GSA enterprise system.

The ability to create such reports has resulted in increased efficiency for sighted GSA Financial

Analysts.

---

[1]     *Oracle Business Intelligence*, Oracle,
http://www.oracle.com/technetwork/middleware/index-084205.html (last viewed Mar. 13, 2018).

30.     Mr. Ashley participated in training to become familiar with the newly-transitioned web-based Oracle Business Intelligence software in early February 2017.

31.     During the training, Mr. Ashley discovered a number of accessibility issues with the Oracle Business Intelligence software.  In attempting to use the software, Mr. Ashley found that he was unable to navigate menus in the Oracle Business Intelligence interface using JAWS keyboard commands.

32.     As a result of his inability to navigate the Oracle Business Intelligence interface, Mr. Ashley was unable to successfully complete the training.  Because Mr. Ashley was unable to complete the training (and because, as discussed below, the software remains inaccessible), he has been unable to use the Oracle Business Intelligence software and is not able to work as efficiently as his sighted colleagues.

**C.     GSA's Systemic, Repeated Accessibility Failures**

33.     Mr. Ashley immediately brought the accessibility concerns about the Oracle Business Intelligence software to the attention of the national Section 508 coordinator for GSA, Daniel Perkins, but his concerns were not ultimately resolved.  On February 2, 2017, Mr. Ashley emailed Mr. Perkins that he was unable to use JAWS keystrokes to navigate menus in the Oracle Business Intelligence interface.  Mr. Ashley followed up with Mr. Perkins more than three weeks later to inquire on the status of GSA's investigation into the matter.  On March 30, 2017, Mr. Ashley met with Mr. Perkins and software developers to discuss his accessibility problems with the Oracle Business Intelligence software.  Meetings to try to assist Mr. Ashley continued into May 2017, with no resolution.

34.     Despite Mr. Ashley's earnest efforts, GSA has made no attempt to improve the Oracle Business Intelligence software since the second half of 2017.

35.     The Oracle Business Intelligence software remains inaccessible to Mr. Ashley today.  Mr. Ashley cannot navigate the Oracle Business Intelligence interface using his JAWS screen reader.  And for the reasons discussed in paragraphs 20 through 24, Mr. Ashley's sighted reader is not an adequate accommodation.  Consequently, Mr. Ashley has not been able to benefit from the increased efficiency that use of the Oracle Business Intelligence software offers other, sighted GSA Financial Analysts.

36.     The accessibility issues that Mr. Ashley has encountered with the Oracle Business Intelligence software and the challenges faced by Mr. Ashley in working with GSA to find solutions for the accessibility issues he raised are representative of a larger pattern of accessibility and Section 508 compliance failures by GSA that have plagued Mr. Ashley throughout his 18-year career.  Mr. Ashley has also been unable to access ETAMS, FMIS, Pegasys, SAP BusinessObjects, Citrix Gateway, and Oracle's Occupancy Agreement Tool.

37.     GSA has not implemented adequate and effective processes for determining the Section 508 compliance of the information technology it develops, procures, maintains, or uses.  Even GSA's intranet was less than 50 percent conformant with Section 508 standards in 2015.[2]

38.     GSA management has instructed other Financial Analysts not to assist Mr. Ashley.  For example, in the fall of 2017, Mr. Ashley took over responsibilities of a co-worker which required him to use ETAMS and SAP BusinessObjects.  When he asked that co-worker for assistance, the co-worker reluctantly agreed but noted that he had been instructed by their former supervisor, Tanya Minor, not to assist Mr. Ashley so that he could "sink or swim."

---

[2]     Training and Usability Division, General Services Administration, *GSA 2014 - S508 Year End 508 Assessment Report (Reporting Period January 1 - December 31, 2014)* 5 (2015) (Attached as Exhibit A).

39.     Although the accessibility challenges and concerns raised by Mr. Ashley over the years have often been met with multiple emails, phone calls, meeting requests, and trainings, little actual progress has been made to resolve the challenges facing Mr. Ashley in using GSA's information technology.

40.     Instead, GSA continues to develop, procure, maintain, and use software without regard for whether it complies with Section 508 and whether Mr. Ashley can use such software.

41.     GSA's failure in relation to Mr. Ashley is emblematic of a larger problem GSA has with Section 508 compliance at the procurement stage.  As reported in GSA's own 2014 - S508 Year End 508 Assessment Report, only 45 percent of solicitations for electronic and information technology included Section 508 language, only five percent of solicitations indicated which 508 standards apply to contract deliverables, no solicitations actually provided a Government Product/Service Accessibility Template (GPAT), only five percent of solicitations stated how vendor proposals are evaluated for 508 compliance, and no solicitations informed the vendor of GSA's option to perform testing to validate vendor 508 conformance claims in the Voluntary Product Accessibility Template (VPAT).[3]

**D.     GSA's Discrimination Against Mr. Ashley**

42.     Over the years, Mr. Ashley's performance reviews have repeatedly instructed him to develop his leadership skills, get more training, and take on more challenging assignments. Yet, Mr. Ashley's ability to do so has been hampered by the aforementioned accessibility challenges which, in turn, have prevented him from effectively competing with other sighted Financial Analysts.

---

[3] *Id.*

43.     For example, in 2012, Mr. Ashley received all ratings of 4 (out of 5) and was told to develop his leadership skills, get more training, and take on more challenging assignments.  In 2013, trying to act on this guidance, he requested and was granted a 120-day detail in the Capital Planning Division during which he took on a leadership role.  When Mr. Ashley returned to the Financial Management Division, he requested a change in job responsibilities to further develop his project management skills.  His request was ignored, as he continued to receive the same kind of work assignments he had been receiving prior to the detail.  That year, he received a lower performance appraisal rating with the same guidance to develop his leadership skills, get more training, and take on more challenging assignments.

44.     Mr. Ashley has been given lower quality work than his sighted counterparts because of his disability.  Whereas many of Mr. Ashley's sighted coworkers have been assigned projects that are reviewed by senior management and allow them interaction with management, Mr. Ashley has been repeatedly assigned to lower-visibility projects where he has no such contact with senior management.

45.     Despite receiving excellent performance reviews from 2011 to 2017 and applying on multiple occasions for a promotion, Mr. Ashley has not been able to advance beyond level GS-13 to a higher-level position.  He has been level GS-13 for almost ten years, while other similarly-situated sighted Financial Analysts have advanced.

46.     Mr. Ashley has applied for dozens of level GS-14 promotions over the years. Most recently, he applied for several open level GS-14 positions within GSA's budget and financial divisions in April 2016 and September 2016.   Despite the fact that he was qualified for the positions, Mr. Ashley was not selected.  Those promotions were given to sighted individuals. After he was denied a promotion, Mr. Ashley was told that he did not have the necessary

experience to be promoted to level GS-14. However, on information and belief, Mr. Ashley's disability was a substantial factor in his not being selected.

47.     Throughout the years, Mr. Ashley has regularly attempted to access various trainings in order to gain the experience required for promotion, only to be denied access to the technology necessary to complete the trainings.

48.     Mr. Ashley has on multiple occasions requested training to become a Contracting Officer's Representative (COR) so that he can have direct input into the criteria for selecting his reading assistants and the actual hiring and management of those readers. Each time, Mr. Ashley's request has been denied.

49.     Mr. Ashley's experience at GSA is consistent with a concerning pattern of underperformance by GSA in recruiting, hiring, retaining, and promoting individuals with disabilities as part of Executive Order 13548 and EEOC's Leadership for the Employment of Americans with Disabilities (LEAD) initiative. In 2015, the average grade for individuals without disabilities was 12.4, as compared to an average of 11.6 for individuals with disabilities (IWDs) and an average of 10.3 for individuals with targeted disabilities (IWTDs) such as deafness, blindness, missing extremities, full or partial paralysis, epilepsy, cognitive disorders, psychiatric illness, and dwarfism.[4] In 2015, GSA fell short of the EEOC's targeted goals for disabled employees and, more significantly, fell below the federal average despite GSA employees not being subject to physical fitness requirements of law enforcement agencies like DOJ, CIA, FBI, and Secret Service.[5]

### E.     Exhaustion of Administrative Remedies

---

[4] *Extract from MD-715, FY 2015* 1-2 (Attached as Exhibit B).

[5] *Id.* at 1.

50.     Mr. Ashley has exhausted his administrative remedies.

51.     Mr. Ashley first raised his concerns with GSA's national Section 508 coordinator, Daniel Perkins, in early February 2017, and initiated informal counseling with an Equal Employment Opportunity (EEO) counselor on March 10, 2017.

52.     During the informal counseling phase, Mr. Ashley's EEO counselor, Vickie Russaw, instructed Mr. Ashley to narrow his formal complaint to focus on the accessibility issues with Oracle Business Intelligence rather than identifying all of the accessibility problems Mr. Ashley has faced over time as well as the professional consequences of those problems.

53.     Mr. Ashley then filed a formal EEO complaint with GSA alleging discrimination based on his disability on April 4, 2017.  On December 15, 2017, GSA issued its Final Agency Decision (FAD) finding that Mr. Ashley was not subjected to discrimination.

## COUNT ONE

### Violations of Section 508 of the Rehabilitation Act - Failure to Provide Comparable Access to Information Technology (29 U.S.C. § 794d)

54.     Mr. Ashley re-alleges and incorporates by reference paragraphs 1 through 53 as if fully set forth herein.

55.     Section 508 of the Rehabilitation Act (29 U.S.C. § 794d) requires GSA, "[w]hen developing, procuring, maintaining, or using electronic and information technology," to ensure that the information technology it uses allows individuals with disabilities who are Federal employees to have access to and use of information and data that is comparable to the access to and use of information and data by federal employees who are not individuals with disabilities.

56.     As explained above, GSA repeatedly has failed to comply with Section 508.

57.     At least the following tools are not Section 508 compliant: Oracle Business Intelligence, ETAMS, FMIS, Pegasys, SAP BusinessObjects, Citrix Access Gateway, and Oracle's Occupancy Agreement Tool.

58.     Although the accessibility challenges and concerns raised by Mr. Ashley over the years have often been met with emails, phone calls, meeting requests, and trainings, little actual progress has been made to resolve the challenges facing Mr. Ashley in using these tools.

59.     GSA continues to develop, procure, maintain, and use software without regard for whether it complies with Section 508 and without regard for whether Mr. Ashley can use such software.

60.     Even when GSA does test for 508 compliance, on information and belief, it does not test for accessibility by blind users, as its testing does not use keystrokes and instead uses the pointing function of a mouse, which blind users cannot use.

61.     As a result of these actions, GSA has deprived Mr. Ashley of the professional opportunities, experiences, and knowledge afforded to sighted GSA employees.

62.     As a result of GSA's conduct, Mr. Ashley has suffered and will continue to suffer discrimination because of his disability.

63.     Mr. Ashley has suffered damages as a result of GSA's repeated failure to comply with Section 508.

**COUNT TWO**

**Violations of Section 501 of the Rehabilitation Act - Failure to Accommodate
(29 U.S.C. § 791)**

64.     Mr. Ashley re-alleges and incorporates by reference paragraphs 1 through 53 as if fully set forth herein.

65.     Because Mr. Ashley is blind, he is an individual with a disability and is thus a member of a protected class.

66.     Mr. Ashley is a Financial Analyst with degrees in accounting and business administration who has received fully satisfactory performance appraisals over the years.  He is fully qualified and capable of performing the essential functions of his job.

67.     GSA had notice of Mr. Ashley's disability and has, at times, attempted to provide him with accommodations because of that disability.  But the accommodations he has received—the JAWS screen reader and sighted reading assistant—do not give Mr. Ashley comparable access to the same information his sighted colleagues have.  Additional accommodations are necessary to reasonably accommodate Mr. Ashley's disability.

68.     As discussed above, the JAWS screen reader cannot be used for a variety of the tools that Mr. Ashley needs, including ETAMS, FMIS, SAP BusinessObjects, and Oracle Business Intelligence.  Several other GSA systems and tools are only partially accessible.

69.     Moreover, a sighted reader is not a reasonable accommodation for the accessibility issues presented by the Oracle Business Intelligence software.  First, a reader requires an invasion into Mr. Ashley's privacy and confidentiality, as discussed above.  Second, a reader nonetheless poses technical challenges of having to train someone with no accounting background on the subject matter as well as the use of the tools.  Even with a reader, Mr. Ashley has been required to spend several hours per week outside of his regular 40-hour work week to try to compensate for time lost because of accessibility impediments.

70.     GSA should have instead provided the reasonable accommodation identified by Mr. Ashley—for GSA to work with Oracle to make Oracle Business Intelligence accessible to Mr. Ashley using his JAWS screen reader—from the beginning.

71.     By failing to provide Mr. Ashley with access to the information and services described above that are available to his sighted counterparts, GSA has failed to reasonably accommodate Mr. Ashley's blindness.

72.     Mr. Ashley has suffered damages as a result of GSA's failure to accommodate his disability.

## COUNT THREE

### Violations of Section 501 of the Rehabilitation Act - Disability Discrimination
### (29 U.S.C. § 791)

73.     Mr. Ashley re-alleges and incorporates by reference paragraphs 1 through 53 as if fully set forth herein.

74.     Because Mr. Ashley is blind, he is an individual with a disability and is thus a member of a protected class.

75.     Mr. Ashley has sought promotions for which he was qualified and was not selected.   The promotions sought by Mr. Ashley were instead awarded to his sighted counterparts.

76.     On information and belief, GSA failed to promote Mr. Ashley because of his disability.

77.     The guidance repeatedly given to Mr. Ashley in his annual performance appraisals—to develop leadership skills, get more training, and take on more challenging assignments—was either a direct result of GSA's depriving Mr. Ashley of the necessary training and leadership opportunities necessary to compete with his sighted colleagues for level GS-14 promotions, or it was pretext for denying Mr. Ashley those promotions.  No matter which of these is the case, the end result is the same: GSA deprived Mr. Ashley of professional advancement opportunities available to his sighted counterparts because of his disability.

16

78.     Mr. Ashley has suffered damages as a result of GSA's discrimination.

**RELIEF REQUESTED**

WHEREFORE, Mr. Ashley respectfully requests that the Court issue judgment in his favor and against Defendant and grant the following relief:

a.   Enter judgment in favor of Mr. Ashley;

b.   Order Defendant to ensure that any new technology procured is compliant with Section 508 and accessible to blind individuals;

c.   Order Defendant to make the following software Section 508-compliant and accessible to blind individuals: Oracle Business Intelligence, ETAMS, FMIS, Pegasys, SAP BusinessObjects, Citrix Access Gateway, and Oracle's Occupancy Agreement Tool;

d.   Declare that Mr. Ashley has been deprived of reasonable accommodations to which he is entitled by nature of his disability, and enjoin the Defendant from the denial of reasonable accommodations to which Mr. Ashley is entitled;

e.   Order Defendant to allow Mr. Ashley to have direct input into the hiring of his reading assistants and to have Mr. Ashley's reading assistants report directly to him;

f.   Order Defendant to promote Mr. Ashley to level GS-14, step 4;

g.   Award Mr. Ashley damages for back pay to compensate Mr. Ashley for (1) improper delay in promotion and (2) time he was required to spend outside of his regular work week to make up for GSA's failures to accommodate his disability;

h.   Order Defendant to pay reasonable attorneys' fees and costs of litigation under 29 U.S.C. § 794a(b);

i.   Such other relief as this Court may deem just.

## REQUEST FOR JURY TRIAL

Mr. Ashley hereby requests a jury trial on all issues of fact and measure of damages.


Dated: March 14, 2018                         Respectfully submitted,

                                              /s/ Daniel E. Valencia
                                              Andrew Soukup, D.C. Bar No. 995101
                                              Daniel E. Valencia, D.C. Bar No. 974818
                                              Nicole Y. Roberts, D.C. Bar No. 198712
                                              COVINGTON & BURLING LLP
                                              850 Tenth Street, NW
                                              Washington, DC 20001-4956
                                              Telephone: (202) 662-6000
                                              Facsimile: (202) 662-6291


                                              Hannah E.M. Lieberman, D.C. Bar No. 336776
                                              Deepinder Goraya, D.C. Bar No. 1025395
                                              WASHINGTON LAWYERS'
                                              COMMITTEE FOR CIVIL RIGHTS AND
                                              URBAN AFFAIRS
                                              11 Dupont Circle, NW, Suite 400
                                              Washington, DC 20036-1226
                                              Telephone: (202) 319-1000
                                              Facsimile: (202) 319-1010


                                              *Counsel for Plaintiff*